UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

| | |
|---|---|
| CARLA L. P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 2:18 CV 60 (JMB) |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Deputy Commissioner of Operations, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On August 4, 2015, plaintiff Carla P. protectively filed applications for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of May 1, 2014. (Tr. 164-65, 166-74). After plaintiff's applications were denied on initial consideration (Tr. 86-90), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 92-93, 94-95).

Plaintiff and counsel appeared for a hearing on August 23, 2017. (Tr. 25-61). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Mary Kathleen Schauwecker, M.S. The ALJ issued a decision denying plaintiff's applications on November 8, 2017. (Tr. 10-24). The

Appeals Council denied plaintiff's request for review on May 21, 2018. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff, who was born in February 1960, was 54 years old on the alleged onset date and lived with her husband and adopted grandson. (Tr. 62, 229-30, 436-37). She completed high school and received training as a cosmetologist. (Tr. 229-30). She previously worked as an unemployment case manager, a receptionist, a customer service representative, an adult-store manager, and a tax preparer. (Tr. 196, 41-44).

Plaintiff listed her impairments as spinal stenosis, bulging discs, arthritis in her lower back, fibromyalgia, thickening of her lower back, depression, balance issues, and blood pooling in her feet. (Tr. 194). In her September 2015 Function Report (Tr. 229-36), plaintiff described her daily activities as having coffee, sitting outside in nice weather, getting dressed, and doing some light chores. She also made sure her son got up to go to school, prepared simple meals, and took care of the family dogs. She listed her hobbies as crocheting, reading and watching television. She used to be able to crochet for hours, but now was limited to 30 minutes a day because her hands got tired. She was unable to sleep without medication because her "brain and body [would] not shut down." (Tr. 230). She had difficulty with dressing and needed to use a shower chair. She had a driver's license and went grocery shopping once a week for two hours. She could walk one block before needing to rest for 15 minutes. She was able to manage financial accounts, but had difficulty with subtraction due to her conditions. She spoke on the phone with her daughter about three times a week and visited her daughter's home about once a month. She had difficulty completing tasks and following instructions and was able to pay

attention for about 30 minutes. She got along well with others, including authority figures. She did not handle stress or changes in routine well. She used a cane and wore glasses. Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using her hands, remembering, completing tasks, concentrating, understanding, and following instructions. In March 2016, plaintiff listed her medications as gabapentin for nerve pain, venlafaxine for depression, oxybutynin for bladder control, and amitriptyline for sleep. (Tr. 277). In June 2017, she was also taking tramadol and acetaminophen #3 and had changed antidepressants. (Tr. 280). A third-party Function Report completed by plaintiff's daughter Edith Springer was consistent with plaintiff's report. (Tr. 240-47).

Plaintiff testified at the August 2017 hearing that she lacked sensation in her feet, which caused her to have poor balance. (Tr. 29). She also had pain in her low back that radiated into her legs and right foot plus arthritis in her hips. (Tr. 30-31). Her fibromyalgia caused pain in her arms and upper back and occasional clumsiness. (Tr. 33). On her worst days, plaintiff did not get up until noon and she found it difficult to focus. Two or three times a week, she was able to get up about 8:00 in the morning and do chores such as laundry and dishes. Her husband worked a night shift so she prepared supper at 2:00 in the afternoon. She rested when he left for work at 5:00. (Tr. 34-36). Three days a week she skipped showering due to a combination of fatigue and pain. (Tr. 37). She no longer left her home very often. She was a deacon in her church and had been very active, but she stopped going in 2015 because she worried about falling on the steps into the church. (Tr. 54).

Plaintiff testified about the pain treatment she received. She had a steroid injection in December 2014 but it proved ineffective and her doctor decided against further injections. (Tr. 45-46). Her medications had been increased to the highest dosages without completely relieving

3

her pain. She used a heating pad "every day, every night." She had been told that a TENS unit was not likely to provide relief. (Tr. 47-48).

Plaintiff testified that her ability to focus was diminished, impairing her ability to complete chores like laundry. She no longer read books. (Tr. 48-49). As recently as 2014, she had been proficient with the tax-preparation software she used for her job, but the following season had been unable use the computer without assistance.[1] (Tr. 50-51). At the time of the hearing, she had not used the home computer for two or three weeks because she had forgotten how to do so. (Tr. 48-49). She could no longer focus enough to drive. (Tr. 60).

Plaintiff testified that her depression began after she was diagnosed with fibromyalgia. (Tr. 52). She took medication but still had days when she was more depressed and avoided other people.

Vocational expert Kathleen Schauwecker was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform medium work, who could never climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl. In addition, the individual could occasionally reach overhead with her right arm, and frequently handle, finger and feel. The person needed to avoid exposure to vibration, moving machinery and unprotected heights. (Tr. 57). According to Ms. Schauwecker, such an individual would be able to perform plaintiff's past work as a tax preparer, receptionist, employment training specialist, order clerk, and manager of a retail store. Her past relevant work as a retail manager and employment training specialist would be precluded if the individual needed to use a cane to

---

[1] Plaintiff's daughter Edith Springer was her supervisor. (Tr. 51). In a statement from August 2017, Ms. Springer stated that during the 2014-2015 tax season, plaintiff no longer knew how to use the tax preparation software. In addition, she was unable to sit for long periods of time, especially when she got cold. (Tr. 285-86).

4

walk. In response to a question from plaintiff's counsel, Ms. Schauwecker testified that all past relevant work would be precluded for an individual who could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk for two hours, sit for six hours, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch or crawl, frequently balance, and avoid exposure to all hazards, who was further limited to simple, routine tasks. All work would be precluded, regardless of exertional level, if the individual missed work two or more days a month due to her impairments or were off-task 20 percent of the day. (Tr. 58-59).

### B. **Medical Evidence**

#### 1. Medical Records

On May 19, 2014, plaintiff sought emergency treatment for worsening back pain with numbness and tingling in her legs. Radiology studies indicated mild to moderate spondylosis of the lumbar spine and degenerative changes. She was diagnosed with sciatica and given hydrocodone. (Tr. 490-99). Within a few days, plaintiff established care with physician Jennifer R. Wisdom-Behounek, M.D., for treatment of back pain and fibromyalgia. (Tr. 364-67). On examination, plaintiff had moderate tenderness to palpation and significant paraspinal spasm. Dr. Wisdom-Behounek prescribed Naproxyn for pain along with amitriptyline and Elavil for fibromyalgia.

In June 2014, plaintiff began a 6-session course of treatment for incontinence and pelvic floor muscle atrophy, using home exercises and the medication oxybutynin. (Tr. 323-34, 312-21, 307-11, 302-06, 297-301, 292-96, 287-91). In December 2014, she reported a 90 percent improvement in her urinary voiding symptoms and 80 to 100 percent improvement in defecatory dysfunction.

On July 8, 2014, plaintiff was evaluated by Ebby George Varghese, M.D., of the Interventional Pain Clinic, for chronic back pain. (Tr. 487-89). Plaintiff reported having radiating lumbosacral pain that she rated at level 7 on a 10-point scale. The pain worsened with activity and improved with heat. The hydrocodone she received at the emergency room provided some relief, while injection treatment and physical therapy had failed. In addition to pain, plaintiff complained of poor balance, poor sleep, and depression with a history of suicide attempts. On examination, plaintiff was not in acute distress. She ambulated independently with a normal gait and was able to stand on her toes and walk on her heels. She was unable to squat as much as 50%. She had full lumbar flexion and 50% lumbar extension as well as normal strength and reflexes. Straight-leg raising and Faber's tests were negative;[2] Gaenslen's sign, compression maneuver and distraction maneuver were positive; and facet loading reproduced her back pain. Dr. Varghese diagnosed plaintiff with chronic pain secondary to untreated fibromyalgia, lumbar facet arthrosis, and sacroiliac joint pain. Dr. Varghese recommended Cymbalta or Savella to treat plaintiff's fibromyalgia, a neurological evaluation of plaintiff's balance issues, a sleep study to try to improve plaintiff's restorative sleep, cognitive behavioral therapy to work on biofeedback and relaxation techniques, and low-impact aerobic exercise. Dr. Varghese noted that injection therapy typically fails to address pain in the context of fibromyalgia, but that a TENS unit might provide relief. Narcotics should be avoided due to plaintiff's history of suicide attempts and ongoing depression. Plaintiff was prescribed Savella on October 1, 2014, but later reported that she had been unable to afford it. (Tr. 352-55, 350-51).

---

[2] "The FABER (Patrick's) Test stands for: Flexion, Abduction and External Rotation. These three movements combined result in a clinical pain provocation test to assist in diagnosis of pathologies at the hip, lumbar and sacroiliac region." https://www.physio-pedia.com/FABER_Test (last visited May 6, 2019). Gaenslen's Test is used to detect musculoskeletal abnormalities and primary-chronic inflammation of the lumbar vertebrae and sacroiliac joint. https://www.physio-pedia.com/Gaenslen_Test (last visited May 6, 2019).

Plaintiff underwent a neurological evaluation on July 17, 2014. (Tr. 476-86). She reported that she lost 40 pounds after she started walking in 2012. More recently, however, her legs had begun to give way and she had restricted her activities because she was afraid of falling. She reported some tingling in her hands and feet and had been dropping things. On examination, she showed impaired proprioception. An MRI of the cervical spine showed mild cervical spondylosis and stenosis, while nerve conduction studies were normal with no evidence of peripheral neuropathy. (Tr. 442, 444-46). Based on the results of blood work, plaintiff's paresthesias were attributed to high levels of B6 and low levels of B12. (Tr. 438-41).

Plaintiff began physical therapy in August 2014. (Tr. 452-57). It was noted that her legs had been run over when she was a child and she had worked physically demanding jobs. She presently lived with her husband and 16-year-old adopted grandson who had behavioral issues. She was able to garden, sew, read, and walk for limited distances. The treatment goals were to improve plaintiff's lower extremity strength, balance, and gait. At discharge on September 20, 2014, plaintiff had made some progress with respect to her gait but otherwise her goals remained unmet. (Tr. 436-37). Plaintiff reported that the exercises often worsened her pain. (Tr. 352, 340-41).

In December 2014 and January 2015, plaintiff was again evaluated for pain management services. (Tr. 335-36, 337-39, 340-41). Plaintiff reported that she had a 20-year history of back pain but recently experienced increased back pain, bilateral leg pain, and numbness and weakness, with loss of balance. She used to be able to walk for three to six miles but now needed to sit down frequently. She did not tolerate pain medications, steroids, or nonsteroidal anti-inflammatories. An MRI revealed primarily spondylitic changes with some degenerative disc disease and neural foraminal narrowing, but not stenosis. (Tr. 337-39). On examination,

she had full muscle strength with decreased coordination on her right side. She had intact motor and sensory function, negative straight leg tests, and no dermatomal weakness. Based on her reported symptoms, she was assessed with lumbar stenosis with neuroclaudication, despite the absence of confirmation in her MRI. (Tr. 341). She received steroid injections of the bilateral lumbar facet joints and sacroiliac joints, without significant relief. Plaintiff was started on a trial of venlaflexine to treat her pain.

On February 3, 2015, plaintiff told neurologist Brandi R. French, M.D., that the venlaflexine was "helping her pain a lot." (Tr. 376-78). On examination, plaintiff's coordination was intact and her gait and station were normal. Dr. French opined that plaintiff's low back pain was probably attributable to her L4-L5 disc protrusion and prescribed Neurontin for further pain relief.

On June 16, 2015, plaintiff saw primary care physician Dr. Wisdom-Behounek, with complaints of pain in her right arm due to a fall three months earlier. (Tr. 345-49). She also reported that she had occasional edema with purple toes. A month later, plaintiff reported that the arm pain was worsening. (Tr. 342-44). On examination, she had some tenderness to palpation but full range of motion. An x-ray showed no fracture or dislocation and she was assessed with bursitis or tendonitis of the shoulder. She had ten physical therapy sessions for bicipital tendonitis and shoulder impingement which resulted in improvement in her pain. (Tr. 522-23, 538-40, 541, 527-28, 529-30, 531-32, 533, 534-35, 525-26, 518, 519). In November 2015, plaintiff told Dr. Wisdom-Behounek that her pain was well controlled with gabapentin and Effexor. (Tr. 500-01).

An x-ray of the lumbar spine completed on January 5, 2016, showed degenerative changes throughout the lumbar spine and subtle stair-step retrolisthesis without acute

abnormality. (Tr. 508-9). The sacroiliac joint also had mild degenerative changes with subtle sclerosis. (Tr. 510-11).

On May 3, 2016, plaintiff sought emergency care for back pain that radiated into her right leg. (Tr. 503-07). On examination, she had limited range of motion of the right leg and pain with movement but not palpation. She had normal sensory and motor function. Her pain improved with injections of Norflex and Nubain. At follow-up on May 31, 2016, Dr. Wisdom-Behounek increased plaintiff's gabapentin. (Tr. 542-43). Plaintiff's fibromyalgia and depression were described as stable and her incontinence was well controlled. X-rays of plaintiff's knees completed in July 2016 showed minimal osteoarthritis. (Tr. 546).

In September 2016, plaintiff told Dr. Wisdom-Behounek that she was "miserable" with increased leg and back pain. The pain affected her ability to think and was causing her to fall. (Tr. 546-49). On examination, she displayed tenderness on palpation of the lumbar spine and sacroiliac joints and was unable to do straight leg raises. Faber's test was positive on the right side. She also complained of worsening depression and stated she was unable to afford the Effexor. Dr. Wisdom-Behounek increased plaintiff's gabapentin dosage and directed her to continue to use her cane when walking. X-rays of plaintiff's hips showed deformity of the right iliac bone — possibly due to past trauma — minimal degenerative changes on the right, and mild joint space narrowing on the left. (Tr. 550). An MRI of the lumbar spine showed mild to moderate disc bulge and facet osteoarthritis throughout the lumbar spine, resulting in severe right and moderate left neural foraminal narrowing at L4-L5. (Tr. 552-53). In place of Effexor, plaintiff was prescribed sertraline, which she subsequently reported was effective in controlling her depression. (Tr. 566, 571).

On September 28, 2016, plaintiff was seen by Terry Thrasher, D.O., to establish care. (Tr. 583-87). Despite a benign physical examination, Dr. Thrasher prescribed Tylenol with codeine for plaintiff's low back pain. He refilled the prescription in December 2016. (Tr. 581-87).

On October 11, 2016, nurse specialist Laura Billings, AHCNS, completed an orthopedic evaluation of plaintiff. (Tr. 554-58). On examination, plaintiff was diffusely and exquisitely tender to palpation throughout her lower lumbar spine. She had positive straight-leg raising and Faber tests. After reviewing plaintiff's MRI, Ms. Billings concluded that plaintiff's back pain was amplified by her fibromyalgia, which was uncontrolled despite efforts to treat it. Ms. Billings informed plaintiff that surgical intervention was not likely to relieve more than a small portion of her pain. A diagnostic right L4 nerve block administered on October 17, 2016, produced immediate pain relief. (Tr. 559-60). On October 26, 2016, she reported that she had a 50% improvement in her pain since the injection. (Tr. 561-63). On examination, plaintiff had some pain with flexion and extension of the spine, but no pain in the hips. Pelvic floor examination revealed tenderness and spasm. She was assessed with severe right-sided stenosis at L3-4 and L4-5. It was noted that she might benefit from radiofrequency ablation or nonsteroidal injection therapy, but not surgery. (Tr. 564-65).

Dr. Varghese re-evaluated plaintiff in November 2016. (Tr. 568-70). Plaintiff reported that her back and leg pain were worsened with standing, bending backwards, and twisting. On examination, plaintiff had full hip strength with tenderness to palpation through the lumbosacral joint and sacrum, which could have been attributable to either poorly-controlled fibromyalgia or joint pain. Dr. Varghese started plaintiff on tramadol and suggested an EMG to determine whether there was denervation at L4. Possible treatment options included medial branch blocks,

radiofrequency ablation, and decompression surgery. Dr. Varghese issued a strong warning to plaintiff to avoid standing, walking, and twisting for any length of time, noting that if plaintiff "pushes herself, the procedures, the surgeries, and medications won't be of any benefit."

Plaintiff was unaware that Dr. Varghese wanted her to follow up in a month and so did not return until February 10, 2017. (Tr. 568-70, 573-74). At that time, plaintiff reported that the gabapentin was not controlling her pain. Her gait was antalgic and she was using a cane. Plaintiff's gabapentin and tramadol doses were increased and, in May 2017, plaintiff reported that her pain was improved on the increased dosages. (Tr. 575-76). Her gabapentin was increased once again.

        2.        Opinion evidence

On December 22, 2015, State agency consultant Mark Altomari, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 66-67, 75-76). Dr. Altomari concluded that plaintiff had medically determinable impairments in the 12.04 category (affective disorders). He noted that plaintiff had a diagnosis of chronic depression but her condition was stable when she was compliant with prescribed medications. He found that plaintiff had no restrictions in the activities of daily living, maintaining social functioning, or maintaining concentration, persistence and pace. She had no repeated episodes of decompensation of extended duration. The ALJ noted that this opinion was consistent with reports showing that plaintiff routinely displayed normal mental status and the fact that she never sought treatment from a mental health specialist. The ALJ assigned Dr. Altomari's opinion significant weight. (Tr. 14). Plaintiff does not challenge the ALJ's assessment of Dr. Altomari's opinion.

11

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and

the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of

Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above, but terminates at step four. (Tr. 10-19). The ALJ found that plaintiff had not engaged in substantial gainful activity since May 1, 2014, the alleged onset date.[3] (Tr. 12). At steps two and three, the ALJ found that plaintiff had the following severe impairments: fibromyalgia and degenerative disc disease of the lumbar spine. The ALJ found that plaintiff's medically determinable impairment of depression was not severe because it caused no more than minimal limitation in her ability to perform basic mental work activities. (Tr. 13). The ALJ next determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[4] (Tr. 14). Plaintiff does not challenge this assessment.

---

[3] The ALJ also found that plaintiff met the insured status requirements through December 31, 2018. (Tr. 12).

[4] The ALJ considered the listings for disorders of the spine (listing 1.04). (Tr. 14).

14

The ALJ next determined that plaintiff had the RFC to perform sedentary work and could only occasionally climb ramps and stairs and never climb ladders, ropes, and scaffolds. She could occasionally balance, kneel, stoop, crouch, or crawl. She should never be exposed to unprotected heights, moving mechanical parts, or vibrations. (Tr. 14-18). In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding her abilities, conditions, and activities of daily living, as well as a statement from her daughter. While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 16).

At step four, the ALJ concluded that plaintiff had the RFC to return to her past relevant work as a receptionist. (Tr. 18-19). Based on plaintiff's testimony and earnings records, the ALJ calculated that plaintiff had worked as a receptionist for 3.41 months, long enough to qualify as substantial gainful activity and for plaintiff to fully learn all the duties of the job. (Tr. 19). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act, from May 1, 2014, the alleged date of onset, through November 14, 2017, the date of the decision. (Tr. 19).

## V. Discussion

Plaintiff argues that the ALJ did not properly determine that plaintiff could return to her past relevant work.

Plaintiff bears the burden of demonstrating that she cannot return to her past relevant work. See Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). An individual is not disabled if she retains the RFC to perform "[t]he actual functional demands and job duties of a particular

past relevant job[] or [t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007) (quoting Jones v. Chater, 86 F.3d 823, 825 (8th Cir. 1996)). Before deciding that a claimant retains the RFC to perform past relevant work, the ALJ must "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and . . . compare that with what the claimant herself is capable of doing . . . ." Nishke v. Astrue, 878 F. Supp. 2d 958, 988 (E.D. Mo. 2012) (quoting Nimick v. Secretary of Health and Human Services, 887 F.2d 864, 866 (8th Cir. 1989)). An ALJ may discharge this duty by referring to specific job descriptions in the Dictionary of Occupational Titles (DOT) and by relying on the testimony of a vocational expert. Wagner, 499 F.3d at 853; Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

The ALJ determined that plaintiff has the RFC to perform sedentary work with additional restrictions on balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs. She was unable to climb ladders, ropes or scaffolds and needed to avoid environmental hazards. (Tr. 14). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); § 416.967(a).

According to plaintiff, her work as a receptionist for an insurance company required her to file papers, take payments, direct callers to destinations, send faxes, make copies, answer the phones, and "execute daily operations." (Tr. 224). In an 8-hour work day, she sat for 7 hours, walked for a half hour, and stood for a half hour. She frequently lifted less than 10 pounds and

never lifted more than 10 pounds. Id. At the hearing, she testified that she also used the computer and took license numbers and messages from callers. (Tr. 39). The vocational expert testified that plaintiff's work as a receptionist was performed at the sedentary level. (Tr. 57). Furthermore, as the ALJ noted, the DOT describes the work of a receptionist as sedentary. (Tr. 19). In combination, plaintiff's testimony regarding her job duties, the DOT, and the vocational expert's testimony constitute substantial evidence that plaintiff's RFC does not preclude her past relevant work as a receptionist.

Plaintiff also argues that the ALJ's determination that she could return to her past work was improper to the extent that it was based on the vocational expert's testimony in response to the hypothetical, which referred to an individual capable of performing work at the medium exertion level. First, the ALJ was not required to pose a hypothetical to the vocational expert. Lane v. Colvin, 650 F. App'x 908, 911 (8th Cir. 2016) (citing Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994)) ("[A]n ALJ need not rely on the testimony of a vocational expert to find that a claimant is capable of returning to past relevant work."). Second, under the applicable regulations, an individual capable performing of medium work is also capable of performing sedentary work. 20 C.F.R. § 404.1567(c); § 416.967(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work."). Plaintiff also argues that the ALJ was required to ask the vocational expert about the impact of her nonexertional limitations — *i.e.,* the postural and environmental limitations the ALJ imposed — on her ability to perform her past relevant work. First, as noted, vocational expert testimony is not required at step 4 of the sequential evaluation. Furthermore, as defined by the DOT, work as a receptionist excludes climbing, balancing, stooping, kneeling, crouching, and crawling, and does not require exposure

to environmental hazards. DOT § 237.367-038, Receptionist, DICOT 237.367-038, 1991 WL 672192.

Plaintiff contends that the ALJ erred in determining that she had worked as a receptionist for a sufficient length of time to qualify as relevant work. According to the vocational expert, plaintiff's work as a receptionist had a Specific Vocational Preparation (SVP) level of 4 (Tr. 57), which requires between three and six months to learn. See DOT, app. C, 1991 WL 688702.[5] (Tr. 57). Plaintiff testified that she held this job for "three months . . . from June to September." (Tr. 55). Based on plaintiff's earning records, hourly wages, and testimony, the ALJ calculated that plaintiff worked for 3.41 months and thus had sufficient time to learn all the duties of the job. (Tr. 19). Plaintiff does not contest the ALJ's finding regarding how long she worked, but does argue that the ALJ was required to ask the vocational expert whether the receptionist job could be learned in three months or required up to six months. [Doc. # 20 at 13]. In making this argument, plaintiff fails to acknowledge she has the burden to show that she cannot perform her past relevant work. Plaintiff failed to show that 3.41 months was not a sufficient amount of time to learn the duties of the receptionist job.

The Court finds that the ALJ properly compared the physical and mental demands of plaintiff's past relevant work with what she was capable of doing and that substantial evidence in the record as a whole supports the finding that plaintiff can return to her past relevant work as a receptionist.

\* \* \* \* \*

---

[5] A job's SVP level is defined as the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance[.]" DOT, app. C, 1991 WL 688702.

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of May, 2019.